804 P.2d 72

**STATE of Arizona, Appellee,**

v.

**Jose Abel FIERRO, Appellant.**

**No. CR–87–0051–AP.**

Supreme Court of Arizona,
En banc.

Dec. 18, 1990.

Reconsideration Denied Feb. 15, 1991.

**542**

Grant Woods, Atty. Gen. by Paul J. McMurdie and Crane McClennen, Asst. Attys. Gen., Phoenix, for appellee.

Dean W. Trebesch, Maricopa County Public Defender by James H. Kemper, Deputy Maricopa County Public Defender, Phoenix, for appellant.

## OPINION

FELDMAN, Vice Chief Justice.

Defendant Jose Abel Fierro (Fierro) was convicted of first degree murder and first degree burglary. He was sentenced to death for the murder and to life imprisonment, without possibility of parole for twenty-five years, for the burglary. We have jurisdiction over this automatic appeal pursuant to Ariz. Const. art. 6, § 5(3), and A.R.S. §§ 13–4031 and 13–4033.

### FACTS AND PROCEDURAL HISTORY

At approximately 10:00 p.m. on September 29, 1985, Merle Moseley, a Phoenix attorney, and his fiancee, Anne Manross, returned to their home in Higley, Arizona to find a burglary in progress. As they drove toward the house, they noticed a strange car in the driveway, lights on in the house, and some of their possessions on the porch. They also noticed a person standing on the porch. Manross dialed the emergency number, 911, from the car telephone as Moseley jumped out of the passenger door, armed with a .38 revolver.

Moseley fired a warning shot, drew a bead on the intruder, and ordered him to stay where he was. Manross informed Moseley that she was on the line with the emergency operator and that the sheriff's department was "coming out." As Moseley shouted at the intruder and repeatedly threatened to shoot him if he attempted to move, Manross told the emergency operator that Moseley was trying to keep the burglary suspect scared. Manross reported, "My headlights are on the guy," and described the intruder's car and gave its license number to the emergency operator. Moseley kept his gun trained on the intruder and moved from the passenger's side, around the rear of his automobile, to the driver's side. As Moseley continued yelling and advanced toward the intruder's car, Manross told the emergency operator that Moseley had been drinking and was "a little excited."

The emergency operator instructed Manross to tell Moseley to calm down and that a deputy was on the way. As Manross conveyed this information to Moseley, shots were fired. Bullets hit the windshield, causing Manross to fall on the seat to protect herself. Struck in the chest by one of the bullets, Moseley told Manross he had been shot and crawled into the back seat behind her.

Manross crashed the car through the gate at the end of the driveway, stopping in the middle of the road. While stopped, Manross began describing the intruder to the emergency operator. She heard another series of shots. She then observed the other car drive away to the north of the back yard, through an alfalfa field. In the process of leaving the scene, the car

crashed through a steel gate, ran over some planking and barbed wire fence, and jumped an irrigation canal.

Fierro left his apartment that night between 7:30 and 8:00 p.m. Sometime between 10:00 p.m. (the time of the confrontation at Moseley's house) and 11:00 p.m., he returned to his apartment, woke his girlfriend, and told her he had been in a "shoot-out" and had accidentally shot himself. He had on a bloody T-shirt and had sustained a wound to his arm. Fierro told his girlfriend to go to the police station and report that his car had been stolen. He drove her to the police station and dropped her off. As she got out of the car, she noticed it had a dent in the front end. She arrived at the police department at 11:27 p.m. and told the police her car had been stolen sometime between 9:00 and 9:15 p.m. from the parking lot of a convenience store near her home.

At 12:40 a.m. on September 30, 1985, a sheriff's deputy observed the car near Williams Field and Val Vista Roads. As the marked patrol car passed him, Fierro pulled onto the shoulder of the road. The deputy turned his car around and parked in front of Fierro's vehicle. As he placed Fierro under arrest, the officer observed a bloody T-shirt, a television, and a black holster in plain view in the car. He secured the car and waited for the detective in charge of the Moseley–Manross burglary and shooting to arrive. The vehicle matched the description of the vehicle used in the burglary/shooting, had sustained front end damage consistent with crashing through a heavy steel gate, and had grass stuck to the left front bumper similar in type to that ripped up by the suspect car as it left the Moseley residence.

Manross later identified the vehicle as the one that had been in the driveway of her home the night of the shooting. She also identified a number of items inside the car as belonging to herself and Moseley. Fierro explained the bloody T-shirt by claiming that it was his blood and that he had to fight two people to get his car back after it had been stolen.

Moseley was flown to Scottsdale Memorial Hospital. The .22 caliber bullet struck the lower lobe of his right lung, traveled through his liver and a kidney, and lodged on the left side of his rib cage. On October 10, 1985, Fierro was indicted for the attempted murder of both Moseley and Manross, and for armed burglary. Moseley died of the gunshot wound on November 20, 1985. Fierro was then indicted on one count of first degree murder. Subsequently, the state filed allegations of dangerous nature, of prior and/or repetitive convictions, and of a dangerous offense committed while on parole.[1]

The jurors found Fierro guilty of first degree murder of Moseley and first degree burglary, and acquitted him of the attempted murder of Manross. They further found the allegation of dangerous nature to be true. Verdict, Dec. 23, 1986. The court later found, for purposes of enhancing the sentence for burglary, that the state proved beyond a reasonable doubt that Fierro was on parole when he committed these crimes. Special Verdict, Mar. 6, 1987; *see State v. Waggoner*, 144 Ariz. 262, 697 P.2d 345 (Ct.App.1984).

After an aggravation/mitigation hearing on the murder conviction, the trial court found three aggravating factors: Fierro had previously been convicted of a felony involving the use or threat of violence, he knowingly created a grave risk of death to a person other than the victim, and he committed the offenses with the expectation of pecuniary gain. The court found no mitigating factors. Fierro was sentenced to death on the murder conviction and to life imprisonment without possibility of parole for twenty-five years on the burglary conviction, as mandated by A.R.S. § 13–604.02.

---

1. Under A.R.S. § 13–604(K), a defendant's sentence may be enhanced if any of the preceding are alleged and either admitted or found to exist by the trial court. Under this subsection, "dangerous nature of the felony" is defined as a felony involving the use or exhibition of a deadly weapon or dangerous instrument or the intentional or knowing infliction of serious physical injury upon another.

**544**

Fierro filed a timely notice of appeal claiming the following errors:

1. He was denied his sixth amendment right to counsel and his fourteenth amendment right to due process of law when the trial court admitted an unreliable in-court identification that followed an uncounseled pretrial identification procedure.

2. The trial court erroneously admitted evidence of a "prior bad act."

3. The trial court erred in imposing the death penalty after receiving and considering victim impact evidence.

4. His death sentence is invalid because the trial judge considered a presentence report.

5. Fierro also argued that the Arizona death penalty statutes are invalid on several grounds. We have previously considered and rejected the constitutional arguments presented. *See, e.g., State v. Fulminante,* 161 Ariz. 237, 258, 778 P.2d 602, 623 (1988) (burden of proof on defendant for mitigating circumstances constitutional), *cert. granted,* —— U.S. ——, 110 S.Ct. 1522, 108 L.Ed.2d 762 (1990), aff'd, —— U.S. ——, 111 S.Ct. 1246, 113 L.Ed.2d 302; *State v. Correll,* 148 Ariz. 468, 483–84, 715 P.2d 721, 736–37 (1986) (jury trial not required for capital sentence); *State v. Harding,* 137 Ariz. 278, 292, 670 P.2d 383, 397 (1983) (prosecutorial discretion upheld), *cert. denied,* 465 U.S. 1013, 104 S.Ct. 1017, 79 L.Ed.2d 246 (1984); *State v. Zaragoza,* 135 Ariz. 63, 69, 659 P.2d 22, 28 (1983) (not an unconstitutional mandatory death penalty statute), *cert. denied,* 462 U.S. 1124, 103 S.Ct. 3097, 77 L.Ed.2d 1356 (1983); *State v. Schad,* 129 Ariz. 557, 574, 633 P.2d 366, 383 (1981) (state's burden of proof for aggravating circumstances constitutional), *cert. denied,* 455 U.S. 983, 102 S.Ct. 1492, 71 L.Ed.2d 693 (1982).

The United States Supreme Court has upheld the constitutionality of Arizona's death penalty statute. *Walton v. Arizona,* —— U.S. ——, 110 S.Ct. 3047, 111 L.Ed.2d 511 (1990). We recently discussed the application of *Walton* in some detail, concluding that the same constitutional arguments Fierro advances here are without merit. *See State v. Amaya–Ruiz,* 166 Ariz. 152, 800 P.2d 1260 (1990). We see no point in

again discussing these arguments. Accordingly, we limit our discussion to claims of errors one through four.

### DISCUSSION

#### I. Guilt/Innocence Issues

**A. Admissibility of the In–Court Identification**

Three days after the shooting, a deputy sheriff put together a photographic line-up that included Fierro and showed it to Anne Manross at Scottsdale Memorial Hospital. After studying the photographs, Manross tapped Fierro's picture and stated that "the eyes are right." Reporter's Transcript (R.T.), Dec. 16, 1986 (a.m.), at 44–45. Manross later called the prosecutor and told him she wanted to see Fierro in person. The prosecutor apparently told her it would be "okay" and gave her information about when and where a pretrial hearing would be held. R.T., Nov. 17, 1986, at 115. Manross attended the pretrial hearing and saw Fierro sitting in the jury box, handcuffed together with a group of in-custody defendants. Manross testified that she picked out Fierro before his name was called by the judge. *Id.* at 120. She was present in the courtroom for approximately fifteen to twenty minutes. Although Fierro was represented by counsel at the hearing, neither he nor his counsel was notified and neither was aware of Manross's presence.

Before trial, Fierro moved to suppress all testimony relating to Manross's identification. After a *Dessureault* hearing, *State v. Dessureault,* 104 Ariz. 380, 453 P.2d 951 (1969), *cert. denied,* 397 U.S. 965, 90 S.Ct. 1000, 25 L.Ed.2d 257 (1970), the trial court denied the motion, finding that the photographic identification was not a result of suggestiveness or misconduct on the part of law enforcement officers and was therefore admissible. The trial court also found that the pretrial hearing Manross attended was not a proceeding governed by *United States v. Wade,* 388 U.S. 218, 87 S.Ct. 1926, 18 L.Ed.2d 1149 (1967) (right to counsel at post-indictment line-up); *Gilbert v. California,* 388 U.S. 263, 87 S.Ct. 1951, 18 L.Ed.2d 1178 (1967) (same); or *Stovall v. Denno,*

388 U.S. 293, 87 S.Ct. 1967, 18 L.Ed.2d 1199 (1967) (one-man show-up). At trial, Manross identified Fierro as the killer.

Fierro now contends only that the court erred in denying his motion to suppress the in-court identification.[2] He argues that the pretrial viewing of Fierro by Manross was both an unduly suggestive pretrial identification procedure and a denial of the right to counsel at a time when counsel was required; either of these defects invalidates the subsequent in-court identification. We turn first to the alleged denial of the right to counsel.

■ Fierro analogizes his case to *Moore v. Illinois*, 434 U.S. 220, 98 S.Ct. 458, 54 L.Ed.2d 424 (1977), which held, per *Gilbert*, that a defendant's right to counsel attached with the commencement of adversarial criminal proceedings and that an uncounseled showing at a pretrial hearing violated this right. As a result, a pretrial identification was inadmissible because the defendant was not represented by counsel. We believe that if the pretrial hearing was a proceeding governed by *Wade/Gilbert*, defense counsel should have been informed that Manross planned to attend. *Moore*, 434 U.S. at 231, 98 S.Ct. at 466.[3] However, because the government did not attempt to bolster its case-in-chief with the pretrial show-up identification, there was no violation of the *Gilbert* rule[4] barring use of identifications conducted in violation of the sixth amendment right to counsel. *Moore*, 434 U.S. at 228, 98 S.Ct. at 466. We turn therefore to determine whether the pretrial identification was unduly suggestive.

■ In Arizona, the "fairness and reliability of a challenged identification are preliminary matters for the trial court whose findings will not be overturned on appeal absent a showing of clear and manifest error." *State v. Day*, 148 Ariz. 490, 495, 715 P.2d 743, 748 (1986) (quoting *State v. Hooper*, 145 Ariz. 538, 544, 703 P.2d 482, 488 (1985), *cert. denied*, 474 U.S. 1073, 106 S.Ct. 834, 88 L.Ed.2d 805 (1986)). To determine whether a defendant was denied due process because of an improper pretrial identification procedure, the trial court must determine whether the identification procedure "created a substantial likelihood of irreparable misidentification," and whether "the state bore sufficient responsibility for the suggestive pretrial identification." *See State v. Williams*, 166 Ariz. 132, 137, 800 P.2d 1240, 1245 (1987). The trial court determined that the pretrial viewing was *not* unduly suggestive and that if it was, it was not obtained by the prosecution for the purposes of identification. Neither conclusion appears to be supported.

■ After viewing Fierro's photograph, Manross said "the eyes are right," but expressed a desire to see Fierro in person. The prosecutor told her exactly when and where she could do so. Unlike usual identification procedures, the circumstances at the pretrial hearing made it a simple matter for Manross to determine whom the prosecutor believed to be the guilty person,[5] especially because she had recently seen Fierro's photograph. After she made that determination, her viewing of Fierro became the functional equivalent of a one-man show-up. At the very least, the defendants assembled—several Hispanics, a Black, and two women—may have comprised a highly suggestive line-up. The

---

**2.** Fierro claims no error in the admission of evidence regarding the photographic line-up and in-person pretrial identifications. The admission of evidence concerning the photographic identification has not been challenged at trial or on appeal. Defense counsel, rather than the state, introduced evidence of the in-person pretrial identification while cross-examining Manross about the in-court identification. R.T., Nov. 25, 1986, at 87–88.

**3.** The United States Supreme Court discussed ways in which presence of counsel may help avoid otherwise suggestive identification procedures. *Moore*, 434 U.S. at 230 n. 5, 98 S.Ct. at 465 n. 5.

**4.** In *Gilbert*, the court remanded because the record did not reveal whether the deprivation of the right to counsel was a procuring cause of the in-court identification or whether it had an independent basis. The sufficiency of the record before us makes remand unnecessary.

**5.** The person to be identified was in handcuffs, in the jury box, in the courtroom where a proceeding in his case was to be held.

only conclusion possible is that the viewing took place under "circumstances which unfairly focused the witness' attention on [Fierro] as the man believed by the police to be the guilty person." *Stovall*, 388 U.S. at 295, 87 S.Ct. at 1979.

■ Nor can we accept the finding that the viewing was not the result of government action. It is true that the state did not suggest the viewing and that it was Manross's own idea. It is also true, however, that the state told Manross where and when to go to see Fierro. The state should not have made it possible for Manross to engage in a one-man show-up or other form of suggestive procedure. If the prosecutor wanted to give Manross a chance to identify Fierro, he need only have undertaken the line-up procedures provided by law. *See* Rule 15.2(a)(1), Ariz.R. Crim.P., 17 A.R.S., and A.R.S. § 13–3905.[6] We conclude therefore that the trial court's findings that the trial identification was neither suggestive nor the result of state action are both unsupported and turn to the ultimate question Fierro raises: did the suggestive pretrial identification taint the subsequent in-court identification?

Even if a pretrial viewing is found to be suggestive, a subsequent in-court identification is admissible if it can be shown to be otherwise reliable. This court has adopted the five factors set forth in *Neil v. Biggers*, 409 U.S. 188, 93 S.Ct. 375, 34 L.Ed.2d 401 (1972), for determining reliability:

(1) the opportunity the witness had to view the criminal at the time of the crime; (2) the witness's degree of attention; (3) the accuracy of the witness' prior description; (4) the level of certainty demonstrated by the witness at the confrontation; (5) the length of time between the crime and the confrontation.

*State v. Hicks*, 133 Ariz. 64, 68, 649 P.2d 267, 271 (1982).

We conclude that the trial court's finding that these five criteria were satisfied is supported by the record in this case, so

that the accuracy of Manross's identification was a question for the jury. Manross had a good opportunity to observe Fierro at the scene of the crime. As the transcript of the 911 call shows, she told the operator that "my headlights are on the guy." R.T., Nov. 24, 1986; Exhibit 74, at 5. Over six minutes elapsed from the time the operator answered the call to the time Fierro fired the shots. Manross was talking to the operator the entire time, describing the situation and the intruder. The transcript shows her attention was focused on the intruder. Her description, while not entirely accurate, was substantially correct.

Fierro claims that Manross's identification was equivocal. The prosecution asserts that it was positive. We have reviewed the testimony and do not find Manross's identification of Fierro to be so uncertain as to be inadmissible. During the photographic line-up, the *Dessureault* hearing, and at trial, Manross testified that Fierro looked like the intruder at the residence. R.T., Nov. 17, 1986, at 88, 105; Nov. 24, 1986, at 74, 88; Nov. 25, 1986, at 66, 68–70. Defense counsel questioned Manross extensively about her observation of the suspect at the scene, the accuracy of her description, and the photographic line-up. R.T., Nov. 25, 1986, at 98–100; Dec. 1, 1986, at 5–11, 28–29, 43. Both the trial court and the jury had the opportunity to assess the degree of certainty of her identification.

Fierro challenges the two-month period between the crime and the pretrial identification as being too long for the identification to be reliable. We do not find this period so inordinately long that an identification would be unreliable as a matter of law. In addition, Manross picked out Fierro's picture from the photo line-up only three days after the crime. At no time did Manross waffle about her identification of Fierro as the suspect; she did not say she was unsure[7] whether Fierro was the man she saw or identify anyone else as possibly being the suspect. She consistently identi-

---

6. This could easily have been done before the hearing, thus preserving Manross's ability to be present at the proceeding.

7. *But see State v. Chapple*, 135 Ariz. 281, 294–96, 660 P.2d 1208, 1221–23 (1983).

fied Fierro as looking like the man she saw the night of the shooting.

We conclude that even if the trial judge clearly erred in finding the pretrial viewing had not been an unduly suggestive identification proceeding for which the state was responsible, Manross's in-court identification of Fierro bore sufficient indicia of reliability and had a source independent of the pretrial viewing so that the admission of the in-court identification did not violate Fierro's due process rights. The trial court did not commit reversible error by admitting the in-court identification.

## B. Prior Bad Acts

Two days prior to the Moseley burglary/shooting, a house owned by Mr. and Mrs. Vogt was burglarized near the Moseley residence. Items taken during the burglary were subsequently found in Fierro's possession. The prosecution wanted to use the prior burglary against Fierro, claiming it was interconnected with the burglary/shooting at the Moseley residence. Fierro moved *in limine* to suppress this evidence, arguing it was evidence of a prior bad act, it was irrelevant and prejudicial, and the state's evidence relating to the prior burglary was not strong enough to take that case to the jury. The trial court denied the motion and the evidence was admitted at trial. *See* Minute Entry, Nov. 19, 1986.

 The general rule is that evidence of other crimes is not admissible to prove the defendant's criminal character but may be relevant and admissible for other purposes if it tends to establish motive, intent, plan, absence of mistake or accident, identity, or an element of the offense charged. Rule 404(b), Ariz.R.Evid., 17A A.R.S.; *see also State v. Jackson*, 121 Ariz. 277, 589 P.2d 1309 (1979). Before evidence of a prior bad act can be admitted, there must be proof sufficient to take the case to a jury. *State ex rel. La Sota v. Corcoran*, 119 Ariz. 573, 583 P.2d 229 (1978); *State v. Mitchell*, 112 Ariz. 592, 545 P.2d 49 (1976).

The proof need not rise beyond a reasonable doubt. *State v. Marahrens*, 114 Ariz. 304, 307, 560 P.2d 1211, 1214 (1977). It is irrelevant that the state does not charge the defendant with the prior crime. *State v. Webb*, 149 Ariz. 158, 164, 717 P.2d 462, 468 (Ct.App.1986).

 After Fierro was arrested for shooting Moseley, the police searched his apartment and found some of the items taken in the Vogt burglary. Fierro's girlfriend testified that on the night of the Vogt burglary, Fierro left home and returned between 8:00 and 9:00 p.m. with some items that he claimed he bought from a man moving to Mexico. These items were later identified as Mr. Vogt's property. Vogt's blue suitcase was found in the driveway of the Moseley residence. A gun identified as belonging to Mr. Vogt was in Fierro's possession when he was arrested. Fierro told the police he bought the items from a fence who ran a secondhand store in Chandler.

These facts constitute substantial circumstantial evidence that Fierro committed the Vogt burglary. While possession of recently stolen property is not sufficient in itself to warrant a conviction for burglary, *State v. Brookshire*, 107 Ariz. 21, 480 P.2d 985 (1971), evidence of the possession of the stolen property, coupled with Fierro's inconsistent and unlikely explanations, would have been sufficient to allow the Vogt case to go to a jury. *State v. Hunter*, 102 Ariz. 472, 433 P.2d 22 (1967); *State v. Goldston*, 126 Ariz. 171, 173, 613 P.2d 835, 837 (Ct.App.1980); C. TORCIA, WHARTON'S CRIMINAL EVIDENCE § 79 (14th ed. 1985).

 The Vogt residence was in the same neighborhood as the Moseley residence. The robberies occurred only forty-eight hours apart. The fact that Fierro escaped apprehension in a residential burglary in the same area two nights previously tends to establish his intent to burglarize and his motive for his admitted presence [8] at the Moseley residence. M. UDALL & J. LIV-

---

**8.** At his evidentiary hearing, Fierro admitted being at Moseley's residence that night but denied he was the person Manross saw; he claimed others were present and fired the shots at Moseley and Manross. R.T., Nov. 18, 1986, at 32.

ERMORE, ARIZONA PRACTICE: THE LAW OF EVIDENCE § 84, at 181 (2d ed. 1982). The facts tend to show that Fierro had targeted this particular neighborhood and apparently knew when the residents would be away. We believe that evidence of the Vogt burglary was also relevant to show identity. *Id.* at 182. We conclude that the trial judge did not err in admitting evidence of the prior bad act.

## II. Death Penalty Issues

### A. Consideration of Presentence Report

 Fierro claims that his death sentence is invalid because some of the information presented in the presentence report did not satisfy A.R.S. § 13–703(C), which requires information relevant to aggravating circumstances to comply with the rules that govern admission of evidence. The information complained of includes opinions of Moseley's son and his executor that Fierro should receive the death penalty, information that Fierro was under investigation for "prior homicides," the opinion of Officer Marley that Fierro should die, information that Fierro had been deported, information about other scrapes with the law that did not rise to the level of the aggravating circumstances enumerated in A.R.S. § 13–703(F)(1), (2), and (8), evidence that Fierro was on parole, and negative impressions of a probation officer.

The trial court based its finding of three aggravating circumstances on evidence presented at trial and evidence presented at a presentence hearing, at which Fierro was present and represented by counsel. The trial judge expressly stated that he did not consider the challenged information, which he recognized as irrelevant. R.T., Feb. 27, 1987, at 4, 78–79.

 It is presumed that a trial judge, aware of the rules of evidence, will not consider inadmissible evidence in making his ruling. *State v. Hadd*, 127 Ariz. 270, 619 P.2d 1047 (Ct.App.1980). In *State v. Beaty*, we held that "[a]bsent proof to the contrary, the trial judge in a capital case must be presumed to be able to focus on the relevant sentencing factors and to set aside the irrelevant, the inflammatory, and

the emotional factors." 158 Ariz. 232, 244, 762 P.2d 519, 531 (1988). Fierro presented no evidence of the trial court's bias or prejudice in this case. Unless there is evidence to the contrary, we presume a judge is impartial and free of bias or prejudice. *State v. Rossi (Rossi II)*, 154 Ariz. 245, 741 P.2d 1223 (1987). The trial judge acknowledged there was information in the presentence report he should not consider, and he assured Fierro that he would consider only the specific objective statutory criteria in determining the aggravating circumstances and the sentence. Because there is no evidence to the contrary, we conclude the judge did just what he said and disregarded the inadmissible material.

### B. Imposition of the Death Penalty

 Whenever the trial court imposes the death penalty, we must conduct an independent review of the record and make a separate determination of the propriety of the sentence. *State v. McMurtrey (McMurtrey I)*, 136 Ariz. 93, 101, 664 P.2d 637, 645, *cert. denied*, 464 U.S. 858, 104 S.Ct. 180, 78 L.Ed.2d 161 (1983). We will not uphold imposition of the death penalty unless either the murder or the defendant differs from the norm of first degree murders or defendants. *State v. Britson*, 130 Ariz. 380, 387, 636 P.2d 628, 635 (1981). This court must first independently review the aggravating and mitigating factors found by the trial court to ensure that they were properly determined and weighed. *State v. Richmond*, 114 Ariz. 186, 560 P.2d 41 (1976), *cert. denied*, 433 U.S. 915, 97 S.Ct. 2988, 53 L.Ed.2d 1101 (1977).

#### 1. *Aggravation/Mitigation Issues*

##### a. *Aggravating Circumstances*

After holding an aggravation/mitigation hearing, the trial judge issued a special verdict under A.R.S. § 13–703(F), finding three statutory aggravating factors had been proven beyond a reasonable doubt: (1) Fierro was previously convicted of a felony in the United States involving the use or threat of violence on another person (§ 13–703(F)(2)); (2) in the commission of the

offense Fierro knowingly created a grave risk of death to another person in addition to the victim of the offense (§ 13–703(F)(3)); and (3) Fierro committed the offense in the expectation of receiving property having pecuniary value (§ 13–703(F)(5)).

### (1) *Conviction of Prior Felony Involving Violence*

▆▆▆▆▆▆ To qualify as an aggravating circumstance under A.R.S. § 13–703(F)(2), a prior conviction must be for a felony that, by *statutory definition,* involves the "use of or threat of violence on another person." *State v. Romanosky,* 162 Ariz. 217, 228, 782 P.2d 693, 704 (1989); *State v. Gillies,* 135 Ariz. 500, 662 P.2d 1007 (1983), *cert. denied,* 470 U.S. 1059, 105 S.Ct. 1775, 84 L.Ed.2d 834 (1985); *appeal after remand,* 142 Ariz. 564, 691 P.2d 655 (1984). If, *under the statutory definition of the crime,* the defendant could commit or be convicted of the crime without the use or threat of violence, the prior conviction cannot qualify as a statutory aggravating circumstance. *State v. Lopez,* 163 Ariz. 108, 114, 786 P.2d 959, 965 (1990); *Romanosky,* 162 Ariz. at 228, 782 P.2d at 704.

At trial, the state presented evidence that Fierro had been convicted of three prior felonies involving violence. On July 6, 1978, Fierro was convicted in Texas of aggravated assault on a police officer. On August 23, 1978, he was convicted in Texas of robbery. On April 19, 1982, he was convicted in Arizona of aggravated assault and resisting arrest. In addition to the evidence the state presented regarding these convictions, Fierro himself admitted at the evidentiary hearing that he had been convicted of these crimes. *See* R.T., Nov. 18, 1986, at 20–22.

▆▆▆▆ In *State v. Arnett,* 119 Ariz. 38, 579 P.2d 542 (1978), we held that "violence," as used in A.R.S. § 13–703(F)(2) (formerly § 13–454(E)(2)), meant the "exertion of any physical force so as to injure or abuse." *Id.* at 51, 579 P.2d at 555. In determining whether a defendant's prior convictions under § 13–703(F)(2) warrant aggravating a life sentence to death, only

those felony convictions in which force was employed or threatened with the intent to injure or abuse will be considered in aggravation. *Cf. Lopez,* 163 Ariz. at 114, 786 P.2d at 965 (creating substantial risk of physical injury does not necessarily involve the use or threat of violence).

Ordinarily, the crimes of robbery and aggravated assault, by definition, involve the use or threat of violence. However, in 1973, the Texas legislature specifically amended the statutes creating these offenses to encompass a broader range of activity. Tex.Penal Code Ann. §§ 22.02 and 29.02 (Vernon 1974). Under the statutory definitions of the Texas Penal Code, a person commits an aggravated assault if he commits an assault and threatens with a deadly weapon or causes bodily injury to a peace officer. *Id.,* § 22.02(a)(2). The Practice Commentary to the 1973 amendment specifically states that

> violence is not necessary, and there is no requirement of intent to injure. It is sufficient for conviction that bodily injury is recklessly inflicted, that fear is knowingly induced, or that the offensive nature of physical contact ought to be known.

*Id.,* Practice Commentary—1973.

▆▆▆▆ The 1973 definition of robbery also employs the same language concerning the reckless infliction of bodily injury. Under the Texas Penal Code, a person commits robbery if, in the course of committing theft, he "intentionally, knowingly, *or* recklessly causes bodily injury to another; or (2) intentionally or knowingly threatens or places another in fear of imminent bodily injury or death." Tex.Penal Code Ann. § 29.02 (emphasis added). Because the Texas legislature has amended its penal code so that "violence" is no longer required to commit these offenses, the Texas convictions for aggravated assault on an officer and robbery cannot be used to establish the aggravating circumstance enumerated in § 13–703(F)(2). *Lopez,* 163 Ariz. at 114, 786 P.2d at 965; *Romanosky,* 162 Ariz. at 228, 782 P.2d at 704.

■ Similarly, under the statutory definition of aggravated assault found in A.R.S. § 13–1204, it would be possible to commit aggravated assault without the use or threat of violence.[9] Because the state presented no evidence specifying under which subsection Fierro was charged and convicted, this conviction also fails to establish an aggravating circumstance under A.R.S. § 13–703(F)(2). Under the circumstances, the state did not prove this aggravating circumstance beyond a reasonable doubt. *See Lopez*, 163 Ariz. at 114, 786 P.2d at 965; *Romanosky*, 162 Ariz. at 228, 782 P.2d at 704. We conclude that the aggravating circumstance of the prior convictions for use of violence was not proved.

### (2) *Grave Risk of Death to Others*

■ This aggravating circumstance requires that during the commission of the offense, the defendant knowingly created a grave risk of death to a person other than the victim of the offense. A.R.S. § 13–703(F)(3). For this aggravating circumstance to apply, the person so endangered must not have been an intended victim of the crime. *See State v. Johnson*, 147 Ariz. 395, 400, 710 P.2d 1050, 1055 (1985); *State v. Rossi (Rossi I)*, 146 Ariz. 359, 366, 706 P.2d 371, 378 (1985). The other person must have been within the zone of danger. *See State v. McMurtrey (McMurtrey II)*, 151 Ariz. 105, 108, 726 P.2d 202, 205, *cert. denied*, 480 U.S. 911, 107 S.Ct. 1359, 94 L.Ed.2d 530 (1987); *Johnson*, 147 Ariz. at 400, 710 P.2d at 1055.

■ At the time of the shooting, Manross was seated in the front seat of the car talking to the 911 operator. Several bullets were fired in the direction of the car and Moseley. One bullet struck Moseley and two bullets struck the windshield of the car, narrowly missing Manross. The trial judge concluded that circumstances indicated that Fierro knew there was another individual in the car and that shooting toward the car would create a grave risk of death to that individual. Special Verdict, Mar. 6, 1987, at 4.

We believe the record supports the finding that Fierro had to have been aware of Manross's presence in the car. According to Manross's testimony at trial, Moseley got out of the car on the passenger side and immediately fired a warning shot. One or both car doors remained open as events transpired and the interior light remained on. The transcript of the 911 call indicates Manross called out to Moseley several times and he responded to her. It is highly likely that Fierro could hear her or could at least infer that someone occupied the driver's seat. Manross was clearly within the zone of danger. Moreover, Fierro's acquittal on the charge of attempted murder establishes that Manross was not an intended victim of the shooting. Verdict, Dec. 23, 1986. *Cf. Johnson*, 147 Ariz. at 400, 710 P.2d at 1055. The evidence supports the finding that Fierro knowingly created a grave risk of death to Manross.

---

9. A.R.S. § 13–1204 provides:

A. A person commits aggravated assault if such person commits assault as defined in § 13–1203 under any of the following circumstances:

1. If such person *causes serious physical injury to another.*

2. If such person uses a deadly weapon or dangerous instrument.

\* \* \* \* \* \*

5. If such person commits the assault knowing or having reason to know that the victim is a peace officer, or a person summoned and directed by such officer while engaged in the execution of any official duties.

A.R.S. § 13–1203 provides:

A. A person commits assault by:

1. Intentionally, knowingly *or recklessly causing any physical injury to another person;* or

2. Intentionally placing another person in reasonable apprehension of imminent physical injury; or

3. Knowingly *touching another person with the intent to* injure, *insult or provoke* such person.

(Emphasis added.)

Thus, under the aggravated assault statute, it would be possible to commit aggravated assault by touching a police officer with the intent to insult or provoke, by recklessly causing physical injury to a police officer, or by recklessly causing serious bodily injury to another. None of these methods would necessarily require the use or threat of violence.

### (3) *Expectation of Pecuniary Gain*

 To prove this aggravating factor, the state must show that the defendant's motivation was the expectation of pecuniary gain. *State v. LaGrand*, 153 Ariz. 21, 35, 734 P.2d 563, 577 (1987). The financial motivation must be the cause of the murder and not merely a result. *Id.; see also State v. Nash*, 143 Ariz. 392, 694 P.2d 222, *cert. denied*, 471 U.S. 1143, 105 S.Ct. 2689, 86 L.Ed.2d 706 (1985); *State v. Libberton*, 141 Ariz. 132, 685 P.2d 1284 (1984). The defendant does not have to intend to kill beforehand to satisfy the statute. *LaGrand*, 153 Ariz. at 36, 734 P.2d at 578. When the defendant kills to facilitate his escape and to permit him to take and keep stolen items, he furthers his pecuniary gain motive. *State v. Walton*, 159 Ariz. 571, 588, 769 P.2d 1017, 1034 (1989); *State v. Hensley (Hensley II)*, 142 Ariz. 598, 604, 691 P.2d 689, 694 (1984).

 We accept the trial judge's finding that this aggravating factor was present. Manross and Moseley interrupted a burglary in progress when they arrived home. The reason for Fierro's presence at the scene was to steal; he expected pecuniary gain, and this expectation tainted all his other conduct. The trial court's finding comports with our prior decisions in cases in which a killing occurred in connection with a robbery or theft. *LaGrand*, 153 Ariz. at 36, 734 P.2d at 578; *Nash*, 143 Ariz. at 405, 694 P.2d at 235; *Hensley II*, 142 Ariz. at 605, 691 P.2d at 695. The shooting was the result of the intended crime of burglary, and the motivation was expectation of pecuniary gain.[10]

### b. *Mitigating Circumstances*

 In sentencing a defendant for first degree murder, the sentencing judge must consider, in addition to the statutory mitigating factors set forth in A.R.S. 13–703(G),[11] any aspect of the defendant's character or record and any circumstance of the offense relevant to determining whether a sentence less severe than the death penalty is appropriate. *State v. McCall*, 139 Ariz. 147, 677 P.2d 920 (1983), *cert. denied*, 467 U.S. 1220, 104 S.Ct. 2670, 81 L.Ed.2d 375 (1984); *McMurtrey I*, 136 Ariz. 93, 664 P.2d 637. The burden is on the defendant to prove any mitigating circumstances by a preponderance of the evidence. *State v. Jordan*, 126 Ariz. 283, 614 P.2d 825, *cert. denied*, 449 U.S. 986, 101 S.Ct. 408, 66 L.Ed.2d 251 (1980).

 The trial judge must consider all mitigating circumstances proffered by the defendant. *McMurtrey I.* However, it is within the discretion of the trial judge how much weight should be given to the proffered mitigating factors. *Jeffers v. Ricketts*, 627 F.Supp. 1334 (D.Ariz.1986), *aff'd in part, rev'd in part*, 832 F.2d 476 (9th Cir.1987). The trial judge considered all the evidence of mitigation offered by Fierro and concluded that there were no mitigating factors, either taken alone or collectively. He further concluded that even if any of the proffered mitigating factors could have been considered mitigating, they were not sufficiently substantial to call for leniency. Special Verdict, Mar. 6, 1987.

 We must independently examine the evidence offered in mitigation to determine whether it was properly weighed so that the sentence imposed was justified. *Nash*, 143 Ariz. 392, 694 P.2d 222. We discussed our role in reviewing death sen-

---

**10.** *But see infra* notes 17 and 18 and accompanying text.

**11.** Those factors are as follows:

1. The defendant's capacity to appreciate the wrongfulness of his conduct or to conform his conduct to the requirements of law was significantly impaired, but not so impaired as to constitute a defense to prosecution.

2. The defendant was under unusual and substantial duress, although not such as to constitute a defense to prosecution.

3. The defendant was legally accountable for the conduct of another under the provisions of section 13–303, but his participation was relatively minor, although not so minor as to constitute a defense to prosecution.

4. The defendant could not reasonably have foreseen that his conduct in the course of the commission of the offense for which the defendant was convicted would cause, or would create a grave risk of causing death to another person.

5. The defendant's age.

tences in *State v. Watson (Watson II)*, 129 Ariz. 60, 628 P.2d 943 (1981):

> Unlike appellate review of non-capital crimes, in reviewing the imposition of the death penalty, we must make an independent determination of the imposition of that penalty. . . . The question before us is not whether the trial court properly imposed the death penalty, but whether, based upon the record before us, we believe that the death penalty should be imposed. A finding merely that the imposition of the death penalty by the trial court was "factually supported" or "justified by the evidence" is not the separate and independent judgment by this court that the death penalty warrants. This is in keeping with the mandate of the United States Supreme Court that we must review carefully and with consistency death penalty cases and not engage in a "cursory" or "rubber stamp" type of review. *Proffitt v. Florida*, 428 U.S. 242, 96 S.Ct. 2960 [49 L.Ed.2d 913] (1976).

*Id.* at 62–63, 628 P.2d at 945–46.

Fierro proffered the following mitigating factors:

1. His capacity to appreciate the wrongfulness of his conduct or to conform his conduct to the requirements of law was significantly impaired;

2. He had a history of alcohol abuse;

3. His age (27);

4. The victim was the initial aggressor;

5. He was not charged with or convicted of premeditated first degree murder;

6. The state refused to make a plea offer that would have excluded the possibility of the death penalty;

7. He expressed remorse at the presentence hearing;

8. He received a timely parole in Texas.

Under the facts of this case, only the first, second, and fourth warrant discussion.

### (1) *Capacity*

■ Although he did not raise mental impairment as a defense at trial, Fierro offered as a mitigating factor that his capacity to appreciate the wrongfulness of his conduct or to conform his conduct to the requirements of law was significantly impaired at the time of the shooting, apparently as a result of heavy consumption of alcohol. He also offered as mitigation the fact that he had a history of alcohol abuse.

Fierro's parents testified on his behalf on this point. Jose Fierro, his father, testified that his son came to his house on the night of the shooting between midnight and 1:00 a.m. to borrow some money for gas. Mr. Fierro testified that his son was drunk at that time. R.T., Feb. 27, 1987, at 17. He also testified that his son's behavior changed when he began drinking and that he would lose control when drunk. *Id.* at 20. Fierro's mother, Apolonia Fierro, also testified that her son was drunk the night of the shooting. She testified that he left the house about 7:30, and was very drunk. *Id.* at 23–24. She testified that when he drank, he would lose control, and would drop on the floor. She claimed he would "never [do] something like this in his full five senses," and that sometimes he could not remember things that happened to him when he had been drinking. *Id.* at 32. She also testified that, from the time he was eleven years old, he heard voices and would complain of severe headaches. *Id.* at 28.

A friend of Fierro's, Juan Rubi, and Fierro's sister also testified that he had a drinking problem and that he would not remember things that happened while he was drinking. *Id.* at 36–39; 40–49. Fierro's girlfriend testified that the day of the shooting, Fierro left the apartment in the afternoon and returned with a heavy odor of beer on his breath. R.T., Dec. 1, 1986, at 77–78. She further testified that he left the apartment again later that evening, and that when he returned between 10:00 and 11:00 p.m. his breath still smelled heavily of alcohol. *Id.* at 80–81; Dec. 2, 1986, at 28.

The defense also offered as mitigating evidence the psychological evaluations of two doctors who examined Fierro at the beginning of the case in order to determine whether he was competent to stand trial.

Otto L. Bendheim, M.D., stated that Fierro claimed to have only partial recollection of the events of that night because he was extremely intoxicated. He claimed to have consumed two fifths of whiskey and three six packs of beer,[12] and to have taken some medication. Dr. Bendheim found that "with the exception of possible alcoholic intoxication," which he could not corroborate from other sources, there was nothing to indicate that Fierro was unaware of the nature, quality, and consequences of his conduct at the time of the crime, but that if Fierro had been as severely intoxicated as he claimed, his impulse control could have been affected. Psychiatric Report dated March 17, 1986. Ronn Lavit, Ph.D., found that Fierro was by report under the influence of alcohol and "may have" been experiencing significant impairments in his cognitive/emotional functioning at the time of the crime. Dr. Lavit reported that Fierro claimed a significant history of alcohol abuse and stated that he drank when he heard voices to "numb" himself from them. Dr. Lavit gave his professional opinion that Fierro's mental condition at the time of the offense was likely impaired by his reported excessive drinking prior to the incident. Psychological Evaluation dated March 25, 1986.

■ Even if the trial court finds the evidence insufficient to establish the mitigating circumstance set forth under A.R.S. § 13–703(G)(1), the court's analysis must also conform to the guidelines we established for considering A.R.S. § 13–703(G)(1) evidence of mental impairment in *McMurtrey I*. It is well settled that a judge should consider any evidence of mental impairment to mitigate capital punishment. *Lockett v. Ohio*, 438 U.S. 586, 98 S.Ct. 2954, 57 L.Ed.2d 973 (1978); *Walton*, 159 Ariz. at 588, 769 P.2d at 1034. In *McMurtrey I*, we reviewed the judge's role:

> If after considering the offered evidence, the court concludes that, with respect to the defendant's mental condition, it merely establishes a character or personality

disorder then the court may, under *Richmond*, conclude that the mitigating circumstance in § 13–703(G)(1) does not exist. In order to remain faithful to *Lockett* and *Watson*, however, the court's inquiry may not end there. The court must consider the offered evidence further to determine whether it in some other way suggests that the defendant should be treated with leniency. For example, a defendant may offer evidence of several factors including a difficult family history in an effort to establish the mitigating circumstance in § 13–703(G)(1). The court may not refuse to consider the independent mitigating effect, if any, of the family history merely because all the factors taken together fail to establish the mitigating circumstance in § 13–703(G)(1).

136 Ariz. at 101, 664 P.2d at 646.

The testimony of Fierro, his family, and his girlfriend provided the only direct evidence of Fierro's intoxication on the night of the crime. The trial judge found that evidence insufficient to establish that Fierro's capacity to appreciate the wrongfulness of his conduct or to conform it to the requirements of the law was impaired at the time he committed the crime. Special Verdict, Mar. 6, 1987. We defer to his conclusion, based as it is on credibility and weight. However, the inquiry should not have ended there. The record reveals that, from age eleven, Fierro has suffered from psychological illness for which his family could not afford adequate psychiatric treatment. R.T., Feb. 27, 1987, at 26–29. The record also reveals that Fierro spent most of the first six months of his post-arrest incarceration in the psychiatric ward of the prison where he exhibited psychotic behavior. He attempted suicide and suffered from headaches, hallucinations, and insomnia. He continued to complain of hearing voices, repeatedly smeared feces on himself, and needed medication to alleviate his condition. Maricopa Medical Center, Treatment Records, Oct. 15, Nov. 6 and 24, Dec. 3, 1985, Jan. 17, 1986. The record further

---

**12.** Fierro apparently reported drinking this amount to both doctors. However, at his evidentiary hearing, he testified that he drank "a couple of pints of whiskey and a couple of six packs." R.T., Nov. 18, 1986, at 13.

reflects a history of alcohol abuse. Given the previous history, we find these facts relevant to an evaluation of Fierro's condition prior to the crime.

We believe these factors, taken together, have the type of "independent mitigating effect" discussed in *McMurtrey I*, despite the failure to establish impaired capacity at the time of the crime. Here, as in *McMurtrey I*, even though the trial court found the evidence did not rise to the level of establishing that the defendant was "significantly impaired" as used in § 13–703(G)(1), he should have realized that the evidence offered on mental impairment had an independent mitigating effect and should have been considered.

### (2) *Victim as Aggressor*

■ Fierro's most emphatic argument for leniency is the fact that the victim had a gun, fired a warning shot at Fierro, threatened Fierro, and may have shot first, frightening Fierro or causing him to believe he had to shoot to save his own life. The fact that a victim produced a gun and fired, precipitating a shoot-out during a residential burglary, has been considered a mitigating circumstance at least once, along with other factors, and used to reduce a death sentence. *Watson II*, 129 Ariz. at 64, 628 P.2d at 947.[13]

In *Watson*, two intruders, one displaying a gun, entered the residence of Mr. and Mrs. Gallman and ordered the couple to get down on the floor. While one of the intruders, Timothy Reid, searched Mrs. Gallman's purse, the other, Spencer Watson, went upstairs. As Reid was leaving the residence, Mr. Gallman obtained a gun and shot him twice. Apparently Watson, coming down the stairs, saw Gallman firing at Reid and shot Gallman four times from behind. *State v. Watson (Watson I)*, 114 Ariz. 1, 4, 559 P.2d 121, 124 (1976). On appeal after remand, we considered, *inter alia*, the fact that the victim fired first in reducing the sentence to life. *Watson II*, 129 Ariz. at 64, 628 P.2d at 947.

In the present case, the circumstances causing Fierro to fear for his life are arguably at least as compelling as the circumstances in *Watson*. Manross testified that Moseley jumped out of the car armed with a .38 revolver, fired off a warning shot, then yelled at Fierro, "The next one is going to be coming at you." R.T., Dec. 1, 1986, at 35–36. The transcript of the 911 call indicates that Moseley threatened several times to shoot Fierro.[14] Manross further testified that just prior to the exchange of gunfire, Moseley, with his gun leveled at Fierro, began to approach and yelled at Fierro to come out.[15] At that point, Manross told the emergency operator that Moseley "had been drinking" and was "a little excited." Transcript of 911 call, at 6. The operator instructed Manross to tell Moseley "to calm down, a deputy is on the way." *Id.* at 7. After Manross told Moseley "the deputy's on his way, take it easy," the shooting commenced. *Id.*

It is not clear from the record who fired first. However, the evidence certainly indicates that it would have been reasonable for Fierro to feel his life was in danger and he had to shoot to save himself. The fact that Fierro was indicted and convicted only on the charge of felony murder and not premeditated first degree murder lends some support to a conclusion that he had not specifically intended to kill Moseley but shot because he feared for his life. While this is certainly neither excuse nor justification for the murder, it is certainly a factor that should be weighed in mitigation. *Watson II*, 129 Ariz. at 64, 628 P.2d at 947.

---

**13.** The court also considered the defendant's age, his model prisoner status, and his continuing education efforts in prison. 129 Ariz. at 64, 628 P.2d at 947.

**14.** For example, at one point Moseley yelled, "Yeah, you are dead." Transcript of 911 call, at 2. He also threatened: "Take a run for it, I'd just as soon shoot your ass." *Id.* at 5. "You go too far, I'll shoot your ass, ... right where you are ... you're gonna get shot if you step out, ... you're not going anywhere, you just step out of there and you're dead." *Id.* at 6.

**15.** The victim began "walking toward the front of their car and yelled.... Yeah, you motherfucker, come out here." R.T., Dec. 1, 1986, at 54.

### c. *Disposition of Aggravation/Mitigation Findings*

The aggravating circumstance of prior conviction of a crime of violence was not established and, on this record, cannot be established. Thus, the trial court erred with respect to one of the three aggravating circumstances. Additionally, the record does not establish that the trial judge complied with *McMurtrey I* when he simply concluded that the mitigating factor of significant impairment was not established. So far as this record shows, the trial judge may not have given weight to the nature of evidence adduced on that point that had an independent tendency to mitigate, even though it did not establish significant impairment. Finally, the trial judge failed to give sufficient consideration in mitigation to the question of whether, under *Watson II*, the victim may have fired first, thus leading Fierro to fire out of fear for his life.

Our usual practice in a case such as this is to remand to the trial court for reconsideration of the death sentence in light of our findings of aggravation and mitigation. However, the disposition of our independent proportionality review makes remand unnecessary.

### 2. *Proportionality review*

▪ When the death penalty is imposed, we also conduct a proportionality review to determine "whether the sentences of death are excessive or disproportionate to the penalty imposed in similar cases, considering both the crime and the defendants." *Richmond*, 114 Ariz. at 196, 560 P.2d at 51. We acknowledge a heightened concern for the proportionality of death sentences imposed in cases involving burglary and robbery. Our concern stems from the United States Supreme Court's mandate that a state may not put a person to death unless its statutory scheme initially narrows the class of those who may be considered for the death penalty, then further narrows the class of those who should actually receive it. *Woodson v. North Carolina*, 428 U.S. 280, 96 S.Ct. 2978, 49 L.Ed.2d 944 (1976); *Roberts v. Louisiana*, 428 U.S. 325, 96 S.Ct. 3001, 49 L.Ed.2d 974 (1976).

Arizona's felony murder statute[16] requires neither premeditation nor intent to kill or injure. It renders death eligible any persons engaged in committing certain enumerated offenses, including robbery and burglary, whenever a death results. In *State v. Clark*, 126 Ariz. 428, 616 P.2d 888 (1980), this court held that a killing committed during the perpetration of a robbery was a killing for pecuniary gain under A.R.S. § 13–703(F)(5)[17] and must be considered an aggravating factor calling for the imposition of the death sentence.[18]

The result of combining these doctrines is that the same factor that renders a person merely eligible for the death penalty— connection with a burglary or robbery—

---

**16.** A.R.S. § 13–1105 states in pertinent part:

A. A person commits first degree murder if:

 \* \* \* \* \* \*

(2) Acting either alone or with one or more other persons such person commits or attempts to commit sexual conduct with a minor under § 13–1405, sexual assault under § 13–1406, molestation of a child under § 13–1410, narcotics offenses under § 13–3408, subsection A, paragraph 7 or § 13–3409, kidnapping under § 13–1304, burglary under § 13–1506, 13–1507 or 13–1508, arson of an occupied structure under § 13–1704, robbery under § 13–1902, 13–1903 or 13–1904, escape under § 13–2503 or 13–2504 or child abuse under § 13–3623, subsection B, paragraph 1, and in the course of and in furtherance of such offense or immediate flight from such offense, such person or another person causes the death of any person.

 \* \* \* \* \* \*

C. First degree murder is a class 1 felony and is punishable by death or life imprisonment as provided by § 13–703.

**17.** Formerly A.R.S. § 13–454(E)(5).

**18.** Justice Gordon concurred with the court's affirmance of the death sentence but disagreed with the pecuniary gain finding, contending that the statutory aggravating circumstance applied only to hired killers. 126 Ariz. at 437, 616 P.2d at 897 (Gordon, J., concurring). *See also LaGrand*, 153 Ariz. at 36 n. 5 and 38, 734 P.2d at 578 n. 5 and 580 (Feldman, J., concurring); *State v. Harding*, 137 Ariz. 278, 296–97, 670 P.2d 383, 401–02 (1983) (opinions of Gordon, V.C.J., and Feldman, J., specially concurring).

may require that death be imposed. We feel an additional responsibility, therefore, to make sure the sentences imposed in these cases are proportionate. In *Watson II*, we reiterated "that the death penalty should be reserved for only the most aggravating of circumstances, circumstances that are so shocking or repugnant that the murder stands out above the norm of first degree murders, or the background of the defendant sets him apart from the usual murderer." 129 Ariz. at 63, 628 P.2d at 946.

Although this crime was certainly tragic, we do not feel the circumstances of the crime set it above the norm of first degree murders. We find the present case differs significantly from those in which we have upheld a death sentence because an unarmed victim or witness was killed during the course of a burglary or robbery to facilitate the defendant's escape or help him evade detection.

In *State v. Hensley*, the defendant and two accomplices decided to rob a bar after casing several grocery stores. Brandishing a .357 magnum, the defendant ordered the three people in the bar, a bartender and two patrons, to lie on the floor. One of the accomplices then took the money from the cash register. Even though the unarmed victims posed no threat, the defendant shot each "execution style" as he left the bar so no witnesses would be left to identify the robbers. 137 Ariz. 80, 83, 669 P.2d 58, 61; *appeal after remand*, 142 Ariz. 598, 604, 691 P.2d 689, 695 (1984).

In *Nash*, the defendant stole a .357 revolver, went to a coin shop, and began talking with the attendant. The defendant then shot the attendant as he sat motionless behind the counter. As the attendant fell, he grabbed a revolver from behind the counter and managed to fire a shot at the

defendant but missed. After this failed attempt at self-defense, the victim pleaded with the defendant for mercy. With obvious premeditation, the defendant shot him twice more, then took approximately $600 from the cash register and fled. 143 Ariz. at 396, 694 P.2d at 226.

In *LaGrand*, the defendant and his half-brother decided to rob a bank. After the manager was unable to open the vault, the brothers took him into his office, where he was bound, gagged, and then stabbed twenty-four times. 153 Ariz. at 23–24, 734 P.2d at 565–66.

We find the facts of the present case readily distinguishable from these murders,[19] and much closer to the facts in the following cases in which a victim was killed because he discovered a burglary in progress.

In *Williams*, the defendant shot and killed a neighbor investigating a residential burglary. We stated that "no explanation for the killing exists other than Bunchek was killed because he discovered a burglary in progress." 166 Ariz. at 142–143, 800 P.2d at 1250–51. Nevertheless, we found that "we are unable to conclude that the death penalty is justified by the manner in which Bunchek was killed." *Id.* (death sentence upheld on other grounds). In *State v. Lujan*, the defendant and others, who had been drinking all afternoon, decided to commit an evening burglary. A resident of the housing unit being burgled happened on the scene. One of the burglars hit the victim, knocking him to the ground. The defendant then stabbed the victim once and fled. This court stated, "We do not, in this case, find the killing to be set apart from the normal first degree murder." 124 Ariz. 365, 372–73, 604 P.2d 629, 636–37 (1979). As with *Williams* and *Lujan*, we find little

---

**19.** *See also State v. Rossi (Rossi I).* The defendant went to the combination shop/residence of a 66–year–old typewriter repairman under the pretext of selling him a typewriter. After apparently negotiating a sale, the defendant followed the victim into the bedroom where he kept a large amount of cash. The defendant hit the victim with a blackjack and then shot him twice in the chest with hydroshock ammunition. The victim fell against a wall and pleaded with the defendant. The defendant then pointed the gun at the victim's head and fired another shot into his mouth. A neighbor arrived to investigate the noises. The defendant hit her in the back of the head, knocking her to the floor. As she lay on the floor, the defendant put the gun to her chest and fired twice. 146 Ariz. 359, 362–63, 706 P.2d 371, 374–75; *appeal after remand (Rossi II),* 154 Ariz. 245, 741 P.2d 1223 (1987); *appeal after remand pending (Rossi III).*

in the present case to set it apart from the norm of first degree murders, especially considering that Moseley, unlike the victims of Williams and Lujan, was armed and threatened the defendant.

We must also consider whether the defendant's background sets him apart from the usual murderer. *Williams*, 166 Ariz. at 142–43, 800 P.2d at 1250–51; *Britson*, 130 Ariz. at 387, 636 P.2d at 635. We have held that Fierro's prior convictions in Texas and Arizona may not be used to establish the aggravating circumstance under A.R.S. § 13–703(F)(2). The prior convictions, however, may properly be considered on proportionality and tend to justify singling him out from other first degree murderers to receive the death penalty. On the other hand, considering Fierro's history of psychological illness, we believe a careful examination of his background renders him less, not more, deserving of a death sentence than the "typical" first degree murderer. Accordingly, we find the imposition of the death penalty in this case would be out of proportion with the penalties imposed in other cases in this state.

## CONCLUSION

We affirm Fierro's murder conviction but modify his sentence, reducing it from death to life imprisonment without the possibility of parole until he has served at least twenty-five years, pursuant to A.R.S. § 13–703(A). However, Fierro's life sentence for first degree murder is to be served *consecutively* to his life sentence for burglary.

We have examined the record for fundamental error, pursuant to A.R.S. § 13–4035. Finding none, we affirm the judgment, as modified.

GORDON, C.J., and BROWN, BUCHANAN and FOREMAN, JJ., concur.

CAMERON, MOELLER, and CORCORAN, JJ., did not participate in this decision; pursuant to Ariz. Const. art. 6, § 3, Judges Michael J. Brown and Robert B. Buchanan of the Pima County Superior Court, and Judge John F.

Foreman of the Maricopa County Superior Court were designated to sit in their stead.