2018 UT App 35

# THE UTAH COURT OF APPEALS

STATE OF UTAH,
Appellee,
*v.*
YELFRIS SOSA-HURTADO,
Appellant.

Opinion
No. 20150583-CA
Filed March 1, 2018

Third District Court, Salt Lake Department
The Honorable Denise P. Lindberg
No. 121902927

Herschel Bullen, Attorney for Appellant

Sean D. Reyes and Karen A. Klucznik, Attorneys
for Appellee

JUDGE RYAN M. HARRIS authored this Opinion, in which JUDGES
JILL M. POHLMAN and DIANA HAGEN concurred.

HARRIS, Judge:

¶1     A father (Father) and his son (Son) were working together in a small corner smoke shop when Defendant Yelfris Sosa-Hurtado, having lost a fistfight with Son less than an hour earlier, entered the smoke shop with a rifle. Defendant fired one shot at Father, missing but causing secondary injuries, then fired three shots at Son, fatally wounding him. Defendant then fired another six shots outside the shop at no particular target.

¶2     After trial, Defendant was convicted of aggravated murder, a first degree felony; discharge of a firearm with injury, a second degree felony; and eight counts of discharge of a firearm, all third degree felonies. The aggravator enhancing Defendant's murder charge was that Defendant, in murdering

Son, also "knowingly created a great risk of death to a person other than [Son]." Defendant appeals all of these convictions, arguing that the aggravator was unsupported by the evidence, and arguing that, for various reasons, the trial court should have granted his motions for mistrial and for new trial. We affirm Defendant's convictions.

BACKGROUND

¶3     On March 14, 2012, Father and Son were working at a smoke shop when Father noticed a car parked in an alley next to the shop that was situated in such a way that Father worried it might cause a hazard for the shop's patrons. Father approached Defendant, who was standing near the car, explained his concerns, and asked Defendant to move the car. Defendant refused. Father noted his own physical disability and stated that there wasn't anything he could personally do about Defendant's refusal, but repeated his concern that people could be injured and reiterated his request that Defendant move his car. Defendant again refused to move the car and asked, "What are you going to do about it?"

¶4     Following this exchange, Father went back inside the smoke shop and told Son what had happened, and Son decided to go outside and talk to Defendant. Son's entreaty was likewise unpersuasive; when Son asked Defendant to move the car, Defendant not only refused, but also punched Son in the face. Son returned blows, and a fistfight ensued, with Son ending up getting the better of Defendant. When the fight was over, Defendant got into the car and fled, and Father and Son went back inside the shop.

¶5     After fleeing from the fistfight, Defendant went to a friend's (Friend) house, and complained to Friend that people at the smoke shop had hit him. Friend offered to help Defendant go back and fight those who hit him. Defendant agreed that this

sounded like a good idea, and so the two of them drove back to the smoke shop. When they arrived, they both exited the car, and Friend began to walk toward the entrance. Before he got there, Defendant passed Friend and entered the smoke shop carrying a high-powered rifle that was approximately three feet long.[1] Once inside, Defendant told a customer to leave the premises, and then began shooting.

¶6    The smoke shop consisted of one room that was approximately twenty-four feet long and fifteen feet wide, with a single door along the longer wall. When Defendant entered the shop, Father and Son were standing behind a waist-high glass counter that was laid out in an S-shape near the wall opposite the door. Father and Son were standing between three and seven feet apart. Defendant proceeded across the small shop, toward Father and Son, until he was standing approximately three feet from the counter and some five feet away from both Father and Son. From this location, Defendant fired a single shot in Father's direction, narrowly missing Father but hitting the glass counter and interior shelving near Father, causing glass and wood shrapnel to hit Father's leg. After this shot was fired, Father fell to the floor behind the counter.

¶7    After missing his shot at Father, Defendant immediately turned toward Son and took one or two steps toward him, saying, "I'm going to kill you." Defendant stopped when he was standing at the counter, approximately three feet away from Son, and extended the barrel of the gun toward Son, so that the muzzle of the rifle was very close to Son. From that location, Defendant shot Son, causing Son to fall on the floor behind the counter. Defendant then leaned over the counter, and shot Son two more times. While Defendant was shooting Son, neither

---

1. No witness testified to the exact length of the rifle, but the rifle's approximate length was clearly shown in photographs admitted into evidence at trial.

Defendant nor his rifle was facing Father; rather, Father was to Defendant's right, about five feet away, on the floor behind the counter. Still, Father was close enough to feel the "muzzle blast" from the rifle on his face as Defendant shot Son. After shooting Son, Defendant left the store through the front door and fired another six shots outside the shop, apparently at no particular target.

¶8 After interviewing witnesses and conducting an investigation, law enforcement officers apprehended Defendant and Friend a few days later. Defendant was charged with aggravated murder, discharge of a firearm causing bodily injury, and eight counts of discharge of a firearm. Friend was charged with murder, and with nine counts of discharge of a firearm. The aggravator enhancing Defendant's murder charges was that Defendant, in the course of murdering Son, also "knowingly created a great risk of death" to Father.

¶9 At trial, Father and several other witnesses testified during the State's case-in-chief, identifying Defendant as the shooter and describing the argument and fistfight between Defendant, Father, and Son. These witnesses also described Defendant's conduct during the shooting itself. Friend was one of these witnesses, and he described his conversation with Defendant following the fistfight, their subsequent drive to the smoke shop, and the events that took place after their arrival. Friend gave this testimony pursuant to a plea bargain in which the State agreed to reduce Friend's charges and recommend only probation in this case in exchange for Friend's truthful testimony. As part of this plea agreement, the State also agreed to dismiss an aggravated burglary charge against Friend in a separate case in which Defendant was also a codefendant. During cross-examination, Defendant's counsel asked Friend about the details of his plea arrangement, including whether he had an aggravated burglary charge pending in a separate case. When Friend answered that question in the affirmative, Defendant's counsel asked if that charge would also be

dismissed as part of the bargain. Friend responded, "I think," at which point the State requested a sidebar.

¶10   During the sidebar, the State explained that the aggravated burglary charge was for an incident that took place ten days prior to the events at the smoke shop. The State acknowledged that it intended to dismiss Friend's aggravated burglary charge, but also stated that part of the plea agreement in this case was that Friend would also testify against Defendant in the aggravated burglary case, if necessary. The State asserted that if Defendant's counsel questioned Friend about the aggravated burglary charge, it would open the door for Friend to disclose that Defendant was a codefendant in that case, thereby alerting the jury to the fact that Defendant also stood accused of committing aggravated burglary in a separate incident just ten days before the events at the smoke shop. In response, Defendant's counsel stated that Friend's counsel had informed Defendant's counsel that Friend's aggravated burglary charge would be dismissed in exchange for Friend's testimony in this case. Defendant's counsel then stated that he would rather not provide the State with an opportunity to tell the jury about Defendant's potential culpability in the aggravated burglary case, and therefore elected to refrain from further questioning on the subject. The trial court then instructed the jury to "disregard any reference or any discussion that was previously made about any unrelated case being dismissed."

¶11   As the trial continued, the State presented further testimony from law enforcement officers who investigated Defendant's involvement in this case. These officers testified that Defendant had access to an AK-74, the type of rifle that the State believed was used in the shooting. One officer (Officer) also testified that, on the day Defendant was arrested, Defendant still had bruising on his face. Following Officer's testimony, the jury submitted proposed questions to the trial court, some of which the court directed Officer to answer. One of these questions asked Officer whether, at the time Defendant was arrested,

Defendant had offered any explanation for the bruising on his face. In response, Officer stated that, while law enforcement officers had noticed the bruising at the time of Defendant's arrest, "because he invoked his rights we weren't able to ask him about that, so we didn't get an answer to that."

¶12 Defendant's counsel quickly objected to Officer's response. Outside the presence of the jury, Defendant's counsel moved for a mistrial, arguing that Officer had improperly commented on Defendant's invocation of his constitutional right to be free from self-incrimination. The State opposed the motion for mistrial, and asserted that Officer's reference to Defendant's invocation of his rights was harmless because it was indirect, inadvertent, and would not be used by the State as evidence of Defendant's guilt. The State instead suggested that the court give a curative instruction to the jury explaining to them that Defendant did nothing wrong by invoking his right to remain silent. In response, Defendant's counsel indicated that she would object to a curative instruction and reiterated that she believed mistrial was the only appropriate remedy for any harm caused by Officer's statement. The court denied Defendant's motion for a mistrial and, because Defendant objected to one, did not give a curative instruction. Neither Defendant nor the State brought up Officer's statement again.

¶13 At the close of the State's case-in-chief, Defendant moved to dismiss the aggravator enhancing his murder charge. Defendant argued that the State had not presented sufficient evidence that Defendant, in murdering Son, had knowingly exposed Father to a great risk of death, because Defendant's shots directed towards Son occurred at close range when Father was several feet outside of Defendant's direct line of fire. Defendant also asserted that because Defendant's first shot (directed at Father) was not one of the shots contributing to Son's death, it should not factor into the analysis of whether Defendant created a great risk of death to Father. The trial court denied Defendant's motion to dismiss the aggravator.

¶14   Following the presentation of the State's case-in-chief, Defendant elected to testify on his own behalf. During the State's cross-examination, Defendant admitted to buying ammunition for an AK-74 at one point in time but denied buying ammunition on four other occasions. In response, the State tried to impeach Defendant by producing ammunition purchase receipts that the State represented were found in Defendant's house pursuant to a search warrant. Defense counsel objected, on the ground that the receipts in question were not in fact seized from Defendant's home. After a brief recess, the State conceded that the receipts had not been found in Defendant's house, and therefore the trial court sustained Defendant's objection. In addition, at the trial court's instruction, the prosecutor explained to the jury that the State could not tie the ammunition purchases represented by the receipts to Defendant, and apologized to the jury for stating otherwise.

¶15   After presentation of the evidence, the case was submitted to the jury, which deliberated for an entire day, from 8:00 a.m. until nearly 5:00 p.m. At about 4:30 p.m., without previously seeking the input of the attorneys, the trial judge entered the jury room and asked the jurors whether they were close to a verdict, such that they could conclude deliberations that day, or whether they thought they would need to come back the next day. The jurors indicated that they thought they were "close to a verdict" but that they would "let [the court] know . . . if [they] needed to reconvene." Within minutes of this communication, the trial judge entered the courtroom and informed the attorneys of the interaction, and made a record of what was said. At the time, neither party objected to the trial court's ex parte communication. A few minutes later, around 5:00 p.m., the jury indicated that it had reached a verdict, which was then read in open court. The jury convicted Defendant on all charges, and determined that the aggravator applied to Defendant's murder conviction.

¶16    About six weeks after Defendant's conviction, the trial court sentenced Defendant to life in prison without the possibility of parole for aggravated murder; to a term of three to fifteen years for discharge of a firearm with injury to another, to run consecutive to the murder sentence; and to a term of three to five years for each of the eight counts of discharge of a firearm, to run concurrently with each other and with the other sentences. Within ten days of sentencing, Defendant filed a Motion for New Trial pursuant to rule 24 of the Utah Rules of Criminal Procedure, which required (at the time) that a Defendant must move for new trial "not later than 10 days after entry of the sentence" and that "affidavits or evidence of the essential facts in support of the motion" must be submitted with the motion. Utah R. Crim. P. 24(b), (c) (2007).[2] Defendant's motion cited to the trial testimony, but did not attach any other supporting evidence. Over the next several months and without seeking leave from the court, Defendant filed a number of affidavits and exhibits, as well as an amended motion for new trial. The trial court refused to consider these additional documents on the ground that they were untimely submitted and procedurally improper. Thus, in evaluating whether to grant Defendant a new trial, the court considered only Defendant's original motion for new trial and the trial record itself.

¶17    In his original motion, Defendant asserted that he was entitled to a new trial for several reasons. First, he claimed that the State "misled" Defendant into believing that Friend's aggravated burglary charge in the separate case would not be dismissed on the basis of Friend's testimony in this case, when Defendant asserts that the State in fact did dismiss Friend's

---

2. This rule was amended, effective on November 1, 2015, to allow a defendant to move for a new trial within fourteen days of sentencing. *See* Utah R. Crim. P. 24(c) (2015). Because the pertinent facts in this case predate the alteration, we cite to the version of rule that applied at the time.

aggravated burglary charge after Friend's testimony in this case. Next, Defendant claimed that he was entitled to a new trial because the receipts that the State attempted to introduce (then withdrew and apologized for after Defendant's objection) were allegedly "doctored" by the State.[3] Finally, Defendant claimed that he was entitled to a new trial because the trial court's ex parte communication with the jury thirty minutes before delivery of the verdict was prejudicial, in that it may have influenced the jury to resolve the case more quickly than it otherwise would have. After reviewing Defendant's motion, the court determined that an evidentiary hearing was not necessary and denied Defendant's motion in a written ruling.

¶18    Defendant appeals.

ISSUES AND STANDARDS OF REVIEW

¶19    Defendant asks us to consider four issues. First, he contends that there was insufficient evidence to support the application of the "great risk of harm" aggravator to his murder conviction, and therefore insufficient evidence to sustain his conviction for aggravated murder. Evidence is insufficient to support a jury verdict when, viewed in the light most favorable to the verdict, it is nonetheless so "inconclusive or inherently improbable" that "reasonable minds must have entertained a reasonable doubt that the defendant committed the crime." *State v. Maestas*, 2012 UT 46, ¶ 177, 299 P.3d 892 (citation and internal quotation marks omitted).

---

3. Specifically, Defendant alleged that the State had "whited out" a facsimile transmission line at the top of the documents. Defendant contends that the presence of the facsimile transmission information on the document demonstrates that the receipts were not found in Defendant's home.

¶20 Second, Defendant contends that the trial court erred when it refused to consider the affidavits and other materials, including an amended motion for new trial, that Defendant submitted in support of his motion for new trial. We review a trial court's decision to grant or deny a motion for new trial for abuse of discretion, *State v. Mitchell*, 2007 UT App 216, ¶ 6, 163 P.3d 737, and we review a trial court's decision to exclude late-filed evidentiary materials under that same standard, *id.* ¶¶ 12–13. "However, 'legal determinations made by the [district] court as a basis for its denial of a new trial motion are reviewed for correctness.'" *Id.* ¶ 6 (alteration in original) (quoting *State v. Loose*, 2000 UT 11, ¶ 8, 994 P.2d 1237).

¶21 Third, Defendant contends that the trial court erred in denying Defendant's motion for new trial, and asserts that he is entitled to a new trial because of: (a) the State's alleged failure to disclose the details of Friend's plea deal to Defendant; (b) the allegedly falsified ammunition receipts; and (c) the court's ex parte communication with the jury. As noted above, we review a trial court's decision to grant or deny a motion for new trial for abuse of discretion. *Id.*

¶22 Finally, Defendant contends that the trial court erred in denying his request for a mistrial when Officer disclosed to the jury that Defendant had invoked his right to remain silent. We will not disturb a trial court's decision to grant or deny a motion for mistrial "absent an abuse of discretion." *State v. Harris*, 2004 UT 103, ¶ 21, 104 P.3d 1250.[4]

---

4. In his brief, Defendant also raised a number of constitutional objections to Utah's statutory sentencing scheme for defendants convicted of aggravated murder. At oral argument, Defendant withdrew those objections, and therefore we do not address them.

ANALYSIS

I. The Aggravator

¶23    Defendant first contends that the evidence was insufficient to support a finding that he knowingly placed Father at "great risk of death" in the course of shooting Son. Arguing from this premise, Defendant asserts that his murder charge should be reduced from aggravated murder to murder. We are unpersuaded.

¶24    "Criminal homicide constitutes aggravated murder if," in the course of "intentionally or knowingly caus[ing] the death of another . . . the actor knowingly created a great risk of death to a person other than the victim and the actor." Utah Code Ann. § 76-5-202(1)(c) (LexisNexis 2017). Defendant argues that, under the facts of this case, he did not create a great risk of death to Father when he shot and killed Son.

¶25    Defendant bases this argument on several contentions. First, Defendant asserts that the three shots he fired at Son should be viewed as "acts of independent significance" separate from both the initial shot Defendant directed at Father and the random shots Defendant fired at no apparent target outside the smoke shop. Second, Defendant asserts that at the time Defendant shot and killed Son, Father was several feet away and out of Defendant's direct line of fire, such that the three shots constituting the murder itself could not have endangered Father. Third, Defendant asserts that the variety of weapon used to kill Son, a rifle, presented minimal risk that Father would be inadvertently injured as compared to the risk that may have been presented by other potential weapons.

¶26    Before directly addressing the merits of Defendant's arguments, it is necessary to frame the discussion by reference to applicable case law. We are aware of only two Utah cases in which this aggravator was at issue: *State v. Pierre*, 572 P.2d 1338

(Utah 1977), and *State v. Johnson*, 740 P.2d 1264 (Utah 1987). In *Pierre*, the use of the aggravator was upheld, and the State relies heavily on that case. In *Johnson*, by contrast, the aggravator was held to be inapplicable, and Defendant analogizes to that case.

¶27    The *Pierre* case involved one of the defendants in the "Hi-Fi Murders" case that made headlines in the 1970s. In that case, the defendant and his accomplices bound five victims in the basement of a "Hi-Fi Shop." *Pierre*, 572 P.2d at 1343. After making them drink Drano from a plastic cup, the defendant forced the victims to lie down and then proceeded to shoot each of them, one by one, in the back of the head with a handgun, killing three of them and seriously injuring the other two. *Id.* At trial, the defendant was found guilty of aggravated murder, with the aggravator being that the defendant knowingly created a great risk of death to the two surviving victims when he murdered the other three. *Id.* at 1343, 1353 n.21. Defendant appealed, contending that, at the time he shot the three victims who died, there was no evidence that the two victims who survived were "placed in a great risk of death." *Id.* at 1355. Our supreme court disagreed, concluding that because "the killing of three victims and the creation of a setting of great risk of death to the two surviving victims occurred in a brief span of time," the defendant's acts in shooting all five victims "formed a concatenating series of events." *Id.* These events, the court determined, did not need to be viewed in isolation but could be viewed as one contiguous course of conduct, and the defendant's shots at the two surviving victims did not need to be considered separately from the defendant's shots at the other three victims. *Id.* Accordingly, the court determined that application of the aggravator was proper. *Id.*

¶28    In *Johnson*, the defendant attacked a husband and wife in a warehouse basement with a shovel handle, striking the husband first and then the wife. 740 P.2d at 1265–66. Eventually, the defendant beat the wife into unconsciousness with the shovel handle, and then walked over to her husband, who was "on the

other side of [the] basement" and out of sight behind some shelves, and beat him with the same shovel handle so severely that he died. *Id.* at 1267. At trial, the factfinder found the defendant guilty of aggravated murder, with the aggravator being that the defendant knowingly created a great risk of death to the wife when he beat the husband to death. *Id.* at 1266. On appeal, our supreme court reversed, holding that the aggravator "properly applies to situations in which the defendant kills his victim in a manner by which he knows he is gravely endangering others." *Id.* The court emphasized that there must be "a likelihood or high probability of great risk of death created, not just a mere possibility," and that there must be "another person within the 'zone of danger' created by [the] defendant's conduct." *Id.* at 1267 (internal quotation marks omitted) (quoting *State v. Price*, 478 A.2d 1249, 1260 (N.J. Super. Ct. Law Div. 1984)). The court stated that "there may be circumstances in which a defendant may be guilty although the endangered person is physically removed from the defendant's conduct," but it noted that "such cases require a careful consideration of a defendant's intent and knowledge of the risk and the endangered person's proximity in time and place to the murder." *Id.* Applying that standard, the court held that the wife was not "within the zone of danger" because, at the time the defendant beat her husband to death with a shovel handle, she was behind shelving on the other side of the basement and in no immediate danger. *Id.*

¶29    Defendant argues that the present case is similar to *Johnson*, because Defendant was turned away from Father and "was aiming nearly point blank" at Son, and asserts that Defendant therefore did not knowingly endanger Father when he killed Son. The State disputes this characterization, arguing that Defendant's first shot at Father should be viewed as connected to Defendant's subsequent shots at Son, that Father was indeed close enough to Son to be "within the zone of danger" when Defendant shot Son, and that due to the risk of

ricochets Defendant's selection of a "high-powered rifle" as a murder weapon increased the relative risk to Father.

¶30   In presenting these arguments, both Defendant and the State appear to agree that several factors are relevant in determining whether the aggravator applies. First, both sides argue about whether the shot Defendant directed towards Father should be viewed in isolation from the shots Defendant directed towards Son, or whether that first shot can be considered as part of the same course of conduct. Second, both sides make arguments about the spatial proximity of Father, Son, and Defendant at the time Defendant shot Son. Finally, both sides make arguments about the type of weapon used. We agree that these considerations, while not necessarily exhaustive, are helpful guideposts in analyzing whether to apply the aggravator.

¶31   Indeed, our review of both Utah case law and of persuasive authority from other jurisdictions reveals that judicial decisions about whether this aggravator applies are often influenced by three main factors: (1) the temporal (or chronological) relationship between any actions the defendant may have taken towards the third party and the acts constituting the murder; (2) the spatial relationship, or proximity, between the third party, the murder victim, and the defendant at the time of the acts constituting the murder; and (3) whether and to what extent the third party was actually threatened by the assailant, either by direct threats or by indirect means such as the risk of stray or ricocheting bullets. *See Pierre*, 572 P.2d at 1355 (discussing whether the events occurred in a "brief span of time" such that they formed a "concatenating series of events"); *Johnson*, 740 P.2d at 1266 (noting that courts must carefully consider "defendant's intent and knowledge of the risk and the endangered person's proximity in time and place to the murder"); *see also State v. Johnson*, 133 P.3d 735, 748 (Ariz. 2006) (listing four factors: proximity, timing, "whether the defendant

intended to kill the third party," and "whether the defendant engaged in sufficiently risky behavior toward the third person").

¶32   Trial courts asked to determine whether to apply this aggravator should consider and weigh these factors, along with other factors that may be relevant in a particular case. This list of factors is not intended to be exhaustive, and no single factor will necessarily be determinative. In applying these factors, courts should keep in mind that the factors are merely aids in answering the overarching question, namely, whether the defendant knowingly created a great risk, and not just a mere possibility, of death to a third person. *See* Utah Code Ann. § 76-5-202(1)(c) (LexisNexis 2017); *Johnson*, 740 P.2d at 1267.

¶33   With regard to the first factor, the holding in *Pierre* makes plain that, under Utah law, the "great risk of death" does not necessarily have to be created at the exact moment of the murder. In other words, the temporal relationship between the murder and the risk to the third party does not have to be simultaneous. In *Pierre*, the defendant shot five people, individually but seconds apart, in the back of the head with a handgun at close range. *See Pierre*, 572 P.2d at 1343. Each individual shot posed little actual risk to anyone other than the person to be shot, yet our supreme court held that because the shots occurred within a "brief span of time" and therefore constituted a "concatenating series of events," they could be considered as part of the same course of conduct. *See id.* at 1355. Certainly, the closer the temporal relationship, the more likely the aggravator will apply. *See generally id.*; *see also State v. Nash*, 694 P.2d 222, 235 (Ariz. 1985) (holding that application of a "grave risk of death to another" aggravator was warranted when a murderer shot a coin shop clerk, pointed the gun at another clerk without firing it, and then shot the first clerk several more times before fleeing). Conversely, the longer the period of time between a murderer's acts toward a third party and the acts constituting the murder, the less likely it will become that the aggravator will apply. *See, e.g., State v. Bowie*, 813 So. 2d 377, 394

(La. 2002) (holding that application of a similar aggravator was not warranted where a murderer fatally shot one man and then, hours later, fired a gun into a car occupied by several persons, because the latter conduct was "temporally" removed from the murder).

¶34 The second factor—physical or spatial proximity—is straightforward: the closer a third party is to the murder victim and/or the defendant at the time of the murder, the more likely it is that this factor will weigh in favor of application of the aggravator. *Compare Johnson*, 740 P.2d at 1267 (holding that a murder that occurred "on the other side of a basement, separated from [the third party] by shelving" did not create a "great risk of death" to the third party), *with Pierre*, 572 P.2d at 1355 (holding that the murder of three individuals within close proximity of two survivors weighed in favor of applying the aggravator); *see also State v. Johnson*, 133 P.3d 735, 748 (Ariz. 2006) (holding that the aggravator applied when a murderer fatally shot a mother while her small child was in the same 10′ by 10′ bedroom with her, even though the murderer did not directly threaten the child); *State v. Fierro*, 804 P.2d 72, 83 (Ariz. 1990) (holding that a murderer created a grave risk of death to his victim's girlfriend when he fired several shots at the victim while the girlfriend was sitting next to the victim in the front seat of a car). *But see State v. Tucker*, 160 P.3d 177, 188–89 (Ariz. 2007) (holding that a defendant who shot and killed two people did not create a grave risk of death to a baby sleeping in the same room five or six feet away from the victims).

¶35 Finally, with respect to the third factor, courts should examine whether and to what extent the third party was actually threatened with harm during the course of the murderous events. This is a fact-intensive inquiry whose application will vary from case to case. In some cases, a threat is obvious: if the defendant shoots at, points a weapon at, or otherwise directly threatens the third party during the course of the murder, this factor will weigh in favor of applying the aggravator. *See Pierre*,

572 P.2d at 1343, 1355 (the two surviving victims were actually shot by the defendant just seconds apart from the murders, and the aggravator applied); *Nash*, 694 P.2d at 235 (the defendant pointed a gun at the third party immediately after and immediately before shooting the murder victim, and the aggravator applied). In other cases, the threat may be less obvious but perhaps present nonetheless, as in cases where a third party may be at risk of harm from a stray or ricocheting bullet. In analyzing this factor's applicability, courts may consider things like the type of weapon used (using a gun is different than beating a victim with fists or a shovel handle), the manner in which the defendant deployed the weapon (spraying a crowd with gunfire is different than training the weapon on one person), and any damage the third party may have actually sustained. *See Johnson*, 740 P.2d at 1265–66 (holding that a third party was not endangered when a defendant beat his victim to death with a shovel handle on the other side of the basement); *see also Richardson v. State*, 376 So. 2d 205, 223 (Ala. Crim. App. 1978) (holding that placing a bomb on a family's porch "created a great risk of death to *many* persons," and therefore applying a more rigorous aggravator than the one contemplated in this case (emphasis added)); *State v. Watson*, 586 P.2d 1253, 1260 (Ariz. 1978) (holding that application of a "grave risk of death to another" aggravator was not warranted when a murderer isolated and killed his victim shortly after all relevant third parties had escaped the scene).

¶36    When we consider these factors in the context of this case, we are persuaded that there was sufficient evidence to support the trial court's decision to allow the aggravator to be presented to the jury. Defendant shot at Father mere seconds before shooting and killing Son, a brief span of time that supports viewing the shots as part of the same "concatenating series of events." *See Pierre*, 572 P.2d at 1355. Further, Father was no more than seven feet away from Son, and some five feet away from Defendant, when Defendant shot Son—in close enough physical proximity that Father could feel the muzzle blast from the shots

targeting Son. Even though Father was not in the direct line of fire at the time Defendant shot Son, his close physical proximity to Defendant and Son at the time Defendant shot Son, coupled with the fact that Defendant had actually fired a shot at Father just seconds earlier, is sufficient for Father to properly be considered within the "zone of danger." *See Johnson*, 740 P.2d at 1267. Finally, Defendant did more than merely make verbal threats or point a gun at Father—Defendant actually fired a rifle shot at Father at close range just seconds before he shot Son, narrowly missing Father but causing wood and glass shrapnel to hit him.

¶37    In light of all of this evidence, we hold that the trial court did not err in denying Defendant's motion at the close of the State's case-in-chief. All three of the factors weigh in favor of application of the "great risk of death" aggravator, and therefore there exists sufficient evidence upon which a jury could base a finding that Defendant, in the course of murdering Son, knowingly placed Father at great risk of death.

## II. The Motion for New Trial

¶38    Defendant next contends that the trial court erred, as a matter of procedure, when it declined to consider both Defendant's amended motion for new trial and the affidavits and exhibits filed subsequent to his original motion for new trial. Defendant also contends that the trial court erred, as a matter of substance, when it denied his motion for new trial. We examine these objections in turn.

### A

¶39    Under the terms of the applicable rule, Defendant had ten days following sentencing to move for a new trial. *See* Utah R. Crim. P. 24(c) (2007). The rule required any such motion to "be accompanied by affidavits or evidence of the essential facts in support of the motion." *Id.* R. 24(b) (2007). If Defendant needed

additional time to file his motion, or to procure affidavits or evidence to support his motion, Defendant was free to petition the court to provide him with additional time. *Id.* R. 24(b)–(c) (2007). In this case, Defendant made no such request at any time. Instead, Defendant filed a motion for new trial within the deadline that cited to the trial transcript but was otherwise unaccompanied by any attachments or other evidence. Then, without seeking leave from the trial court, and after the filing deadline had expired, Defendant filed several affidavits and exhibits intended to be supportive of his motion. Finally, months after the filing deadline had expired, Defendant attempted to file an amended motion for new trial, incorporating all of the later-filed materials. The district court refused to consider the untimely filed materials, and chose to limit its review solely to Defendant's original motion for new trial and the trial transcript. Defendant asserts that the trial court's refusal to consider his later-filed exhibits and supplemental materials was erroneous.

¶40    Defendant's argument is foreclosed by this court's ruling in *State v. Mitchell*, 2007 UT App 216, 163 P.3d 737. In that case, a defendant timely filed a one-paragraph motion for new trial after his sentencing. *Id.* ¶ 3. The motion alleged juror misconduct and referred to newly discovered evidence inconsistent with a witness's trial testimony, but was not actually supported by any attached affidavits or other evidentiary materials. *Id.* A few weeks later, after the original filing deadline had elapsed, the defendant filed a "request for an extension of time in order to submit evidentiary support." *Id.* The trial court did not immediately act on the request for an extension of time, but nevertheless, over the course of several months, the defendant filed additional affidavits in support of his motion for new trial. *Id.* ¶ 4. The trial court ultimately refused to consider the additional affidavits, and denied the defendant's motion. *Id.* ¶ 5.

¶41    On appeal, we affirmed the trial court's decision, stating that the court "did not exceed the permitted range of its discretion when it denied [the defendant's] motion for a new

trial as untimely and incomplete." *Id*. ¶ 13. We noted that, while rule 24 of the Utah Rules of Criminal Procedure allows a party to ask for an extension of time within which to file its motion or any accompanying materials, *see id.* ¶ 10 (citing Utah R. Crim. P. 24(b) and (c) (2005)), a request for any such extension under subsection (c) must be made within the original filing period, *id.* ¶ 11, and the decision to grant a request under either subsection remains entirely within the trial court's discretion, *id.* ¶ 12 & n.2; *see also* Utah R. Crim. P. 24(b) (2007) (stating that the trial court "*may* postpone the hearing on the motion" to allow the filing of additional affidavits "for such time as it deems reasonable" (emphasis added)); *id.* R. 24(c) (2007) (stating that a motion for new trial must be filed within ten days "or within such further time as the court *may* fix" (emphasis added)). In *Mitchell*, the defendant made no timely request for an extension of time. *See Mitchell*, 2007 UT App 216, ¶ 3. Accordingly, we held that neither the defendant's untimely "request for additional time to file affidavits nor the actual filing of his affidavits operates to render his original motion complete and timely," and that the trial court did not abuse its discretion in refusing to consider the late-filed materials. *Id.* ¶ 13.

¶42 In this case, unlike the defendant in *Mitchell*, Defendant made no request at all—whether timely or untimely, or whether under rule 24(b) or rule 24(c)—for an extension of time to file his amended motion or additional materials. He simply filed them without asking for permission to do so. The trial court refused to allow those late-filed affidavits, and in light of our decision in *Mitchell* we cannot conclude that the trial court abused its discretion in so doing.[5]

_____

5. In complex cases, it might seem unrealistic to expect a defendant to prepare and file a motion for new trial, including all supporting documentation, within ten (or fourteen) days after sentencing. However, in most cases, a defendant will know very soon after the jury's verdict that he or she might want to move

(continued…)

¶43    Defendant argues that, "once an initial timely showing is made that the defendant has a substantially compliant motion for new trial, . . . unless the State has some legitimate objection, affidavits and other materials filed after the [filing of] the initial [m]otion should be accepted unless such filing delays an evidentiary hearing." To be sure, it would have been well within the trial court's discretion to accept the late-filed materials. But the rule for which Defendant advocates—a presumption that late-filed materials should be accepted by the trial court—is at odds with this court's decision in *Mitchell* determining that such decisions lie within the sound discretion of the trial court.

¶44    Defendant has not demonstrated, on the facts of this case, that the trial court abused its discretion when it refused to consider Defendant's untimely filed addenda and amended motion. We therefore find no occasion to disturb that ruling.

B

¶45    Despite refusing to consider the late-filed materials, the trial court did review and make a ruling upon the merits of Defendant's motion for new trial, considering only the memoranda filed by the parties as well as the trial transcript. Defendant contends that the court erred when it denied that motion on its merits, and maintains that he is entitled to a new trial for three reasons: (a) the State violated his constitutional rights by failing to disclose the details of its plea deal with

---

(…continued)
for a new trial, and in many cases, sentence is not imposed until six or seven weeks following the verdict. As a practical matter, then, a defendant will usually have significantly longer than ten (or fourteen) days to prepare a motion for new trial. In this case, for instance, sentencing occurred forty-one days after the verdict, and Defendant therefore had more than fifty days, even without an extension, to prepare his motion for new trial.

Friend; (b) the State prejudiced Defendant's case by presenting falsified evidence in the form of the four ammunition receipts; and (c) the court's ex parte communication with the jury prejudiced Defendant. We find none of Defendant's arguments persuasive.

1

¶46    First, Defendant asserts that he was entitled to a new trial because the State allegedly failed to disclose the full details of its plea agreement with Friend, thus violating Defendant's constitutional rights. It is well-established that prosecutors must disclose to defendants all exculpatory evidence in their possession, *see Brady v. Maryland*, 373 U.S. 83, 87 (1963), and that this duty includes an obligation to disclose any plea bargains that the State may have reached with witnesses, *see Giglio v. United States*, 405 U.S. 150, 154–55 (1972). However, "[w]hen claiming that the prosecution's failure to disclose evidence requires a new trial . . . a defendant must show" not only that the State failed to disclose evidence, but also that: (1) the undisclosed evidence is "'favorable to the accused, either because it is exculpatory, or because it is impeaching'"; (2) the evidence has been "'suppressed by the State, either willfully or inadvertently'"; and (3) prejudice has ensued. *See State v. Pinder*, 2005 UT 15, ¶ 24, 114 P.3d 551 (quoting *Strickler v. Greene*, 527 U.S. 263, 281–82 (1999)).

¶47    Here, Defendant maintains that the State suppressed some of the details surrounding its plea agreement with Friend. Specifically, Defendant asserts that, when asked at trial if Friend's separate aggravated burglary charge was being dismissed in exchange for Friend's testimony in this case, the State clarified that the dismissal of Friend's aggravated burglary charge was conditioned in part on Friend testifying truthfully against Defendant in the aggravated burglary case. Defendant claims that, in fact, the State intended to dismiss Friend's aggravated burglary charge solely in exchange for Friend's

testimony in this case, and that the State failed to disclose this information when Defendant's counsel asked about the details of the plea deal.[6] Accordingly, Defendant maintains he is entitled to a new trial. We disagree.

¶48    First, we note that "courts universally refuse to overturn convictions where the evidence at issue is known to the defense prior to or during trial" or "where the defendant reasonably should have known of the evidence." *Id.* ¶ 25 (citing *State v. Bisner*, 2001 UT 99, ¶ 33, 37 P.3d 1073 (internal quotation marks omitted)).[7] At trial, Defendant's counsel indicated that Friend's counsel had informed him that Friend's aggravated burglary charge would be dismissed solely in exchange for Friend's testimony in the present case. Because of this, even if the terms of the plea agreement were as Defendant alleges, and even if the State improperly failed to disclose those terms, Defendant knew or reasonably should have known all of the relevant details of the arrangement through his counsel's discussions with Friend's counsel.

---

6. As a threshold matter, we note that some of Defendant's untimely-filed addenda to his motion for new trial purportedly provided further evidence on this issue. Because we have already determined the trial court did not abuse its discretion when it refused to consider Defendant's untimely filings, we consider only the facts which were properly before the court, chiefly the facts presented in the trial transcript itself.

7. "We are aware that some federal circuits do not read *Brady*" to permit a prosecutor to disclose exculpatory evidence during trial. *State v. Mitchell*, 2013 UT App 289, ¶ 34 n.5, 318 P.3d 238 (citing *United States v. Burke*, 571 F.3d 1048, 1054 (10th Cir. 2009)). "However, *Pinder* controls our decision here and we do not look beyond it." *Id.*

¶49    Moreover, we note that even had Defendant not known the true details of Friend's plea deal with the State, and even if it were clear that the State suppressed those details, there is no evidence that Defendant sustained any prejudice as a result. Indeed, the jury in this case already knew from Defendant's cross-examination of Friend that Friend was also charged with murder and discharge of a firearm in this case, and that, by testifying against Defendant, Friend was receiving a favorable plea deal. Previously we have held that, where a jury is already aware that a codefendant is receiving a plea deal in exchange for his testimony, "[t]he mere possibility of a more favorable deal for [a codefendant]" does "not substantially affect [that codefendant's] credibility as a witness." *State v. Howell*, 2016 UT App 90, ¶ 14, 374 P.3d 1032. In this case, Defendant fails to convincingly demonstrate that making the jury aware of one more charge that would purportedly be dismissed in exchange for Friend's testimony would have materially altered the jury's view of Friend's credibility, much less that it would have materially altered the overall outcome at trial.

¶50    Finally, we note that Defendant's counsel had a compelling tactical reason to refrain from further exploring the details of Friend's plea arrangement. As the State noted during the sidebar, Defendant was charged as a codefendant for the same aggravated burglary as Friend, so inquiring further into Friend's plea deal with respect to the aggravated burglary charge may have opened the door for the State to inform the jury that Defendant had been charged with aggravated burglary as well. Upon considering this possibility, Defendant's counsel indicated that he believed "open[ing] that door" would constitute ineffective assistance of counsel, and thus he declined to inquire further into the details of the plea deal. We agree with Defendant's trial counsel that there was a plausible tactical basis for counsel to refrain from making further inquiry into the details of Friend's plea agreement. Accordingly, "where the defense had the opportunity to use . . . evidence to its advantage during trial but [fails] to do so," we do not overturn a conviction

based on the alleged suppression of that evidence. *Bisner*, 2001 UT 99, ¶ 33.

¶51 Under these circumstances, the trial court did not err when it determined that Defendant was not entitled to a new trial because of any issue with the State's disclosure of the terms of Friend's plea bargain.

2

¶52 Defendant next asserts that he was entitled to a new trial due to the State's actions in attempting to introduce the ammunition receipts. Defendant contends on appeal that the State "doctored" the receipts to implicate Defendant and that their introduction at trial was "so outrageous as to shock the conscience," thus meriting remand for a new trial under *State v. Colonna*, 766 P.2d 1062, 1066 (Utah 1988) (noting that an officer's egregious conduct may constitute a due process violation warranting reversal of a conviction). However, Defendant's motion for new trial was accompanied by no timely evidence supporting this claim. Further, Defendant received everything that he asked for on this issue at trial: the evidence was excluded, the trial court admonished the jury not to consider it, and the State apologized to the jury for its introduction. Under these circumstances, the trial court did not abuse its discretion in determining that Defendant was not entitled to a new trial on the grounds that the State had allegedly "doctored" the receipts.

3

¶53 Finally, Defendant asserts he was entitled to a new trial on the basis that he was prejudiced by the judge's ex parte communication with the jurors, in which the judge asked the jurors whether they would be finished deliberating soon or whether the jury would need to continue deliberations the next day. Defendant contends that this communication was prejudicial because it could have influenced the jury to end its

deliberations by 5:00 p.m., and argues that the jury might not have found him guilty if it had deliberated longer. Defendant cites *Remmer v. United States*, 347 U.S. 227, 229 (1954) (holding that ex parte communications with the jury are "deemed presumptively prejudicial" if not made pursuant to court rules, instructions, or directions of the court "with full knowledge of the parties"), and asserts that, at minimum, the trial court should have presumed that prejudice occurred and held a hearing to determine whether the court's communication actually prejudiced the jury.

¶54 However, as the State notes, our supreme court has clarified that prejudice is not automatically presumed where it is the judge—rather than someone else—who communicates ex parte with a jury. *See State v. Maestas*, 2012 UT 46, ¶ 69, 299 P.3d 892 (declining to "automatically presume prejudice where a judge communicates ex parte with the jury," and noting that "'[t]here is scarcely a lengthy trial in which one or more jurors do not have occasion to speak to the trial judge about something, whether it relates to a matter of personal comfort or to some aspect of the trial'" (quoting *Rushen v. Spain*, 464 U.S. 114, 118 (1983)). Indeed, where "the judge's communication with the jury [does] not involve any substantive issues," but instead is "brief and deal[s] with the timing of the jury's dismissal for the day," our supreme court has indicated that a presumption of prejudice is not warranted, especially where "the judge appropriately disclose[s] the communication" to both parties at trial "and neither [party] [objects] to the interaction." *Id.* ¶ 70. In this case, the trial court's discussion with the jurors closely resembles the benign conversation described in *Maestas*: it was brief, it did not touch on any substantive issues, it dealt with the timing of the jury's dismissal for the day, and it was disclosed to both parties very soon thereafter, with no objection lodged by either side. Accordingly, the trial court did not err when it did not presume prejudice arising from its scheduling communication with the jury, nor did it abuse its discretion in determining that

Defendant was not entitled to a new trial on the basis of that communication.

### III. Motion for Mistrial

¶55    Finally, Defendant contends that the trial court erred when it denied his motion for a mistrial after Officer's revelation to the jury that Defendant invoked his constitutional right to remain silent after being apprehended. Typically, we will reverse a court's denial of a motion for mistrial only if the record "clearly shows" that the incident alleged to be grounds for the mistrial "so likely influenced the jury that the defendant cannot be said to have had a fair trial." *State v. Butterfield*, 2001 UT 59, ¶ 46, 27 P.3d 1133 (citation and internal quotation marks omitted). Defendant has not satisfied this standard.

¶56    Defendant correctly argues that the State may not use his post-arrest silence against him. *See Doyle v. Ohio*, 426 U.S. 610, 617–20 (1976) (holding that the "assurance that silence will carry no penalty" is "implicit to any person" and that using a defendant's silence to impeach that defendant violates due process). However, "mere mention that a defendant invoked his constitutional rights does not prima facie establish a due process violation." *State v. Harmon*, 956 P.2d 262, 268 (Utah 1998). Rather, "*Doyle* rests on the fundamental unfairness of implicitly assuring a suspect that his silence will not be used against him and then using his silence to impeach an explanation subsequently offered at trial." *Greer v. Miller*, 483 U.S. 756, 763 (1987) (citation and internal quotation marks omitted). Because of this, we "look at the circumstances in which a criminal defendant's post-arrest silence . . . is revealed in court in order to determine whether the purposes underlying the rule in *Doyle* have been undermined." *Harmon*, 956 P.2d at 268 (citation and internal quotation marks omitted). Further, even if we find that the rule established in *Doyle* has been violated, we will not reverse a conviction if the violation is harmless "beyond a reasonable doubt." *State v. Maas*,

1999 UT App 325, ¶ 14, 991 P.2d 1108 (citation and internal quotation marks omitted).

¶57 Here, Defendant alleges that Officer's statement indicating that Defendant invoked his right to remain silent was used to impeach Defendant, placing it squarely within *Doyle*'s prohibition. However, Defendant fails to explain how Officer's statement actually operated to impeach him. Indeed, Defendant makes no effort to tie Officer's statement to any particular statement or position of Defendant's that Defendant's post-arrest silence was used to impeach. Neither Officer nor the State ever related Officer's statement to any particular action or statement by Defendant, and no party made any mention of Officer's statement again during the trial. We simply cannot see how Officer's statement was used to impeach Defendant in any way.

¶58 Further, even if we assume, for the sake of argument, that Officer's statement was somehow used to impeach Defendant, we have no difficulty concluding that any such impeachment was harmless beyond a reasonable doubt. Officer's statement was brief, comprising just three lines in the trial transcript, and came after the jury had already heard evidence from several witnesses establishing Defendant's conduct prior to and during the murder. The State did not refer to Defendant's silence at any other time during the entirety of the trial, and at the time the comment was made it did not concern any narrative that Defendant offered or eventually would offer at trial. Further, the trial court offered to issue a curative instruction to the jury, which offer Defendant refused. Against this backdrop, and given the strength of the evidence supporting Defendant's conviction, we are persuaded that any possible violation of Defendant's rights occasioned by Officer's statement was harmless beyond a reasonable doubt. *See State v. McCallie*, 2016 UT App 4, ¶¶ 36, 38, 369 P.3d 103 (categorizing a *Doyle* violation as harmless beyond a reasonable doubt where the violation was an "isolated reference" and the prosecution's case was otherwise strong), *cert. granted*, 384 P.3d 567 (Utah 2016).

CONCLUSION

¶59   The jury's verdict convicting Defendant of murder and applying the aggravator that in the course of the murder Defendant knowingly created a great risk of death to Father was supported by the evidence. Further, the trial court did not abuse its discretion when it refused to consider late-filed addenda to Defendant's motion for new trial, or when it denied that motion on its merits. And the trial court did not err in denying Defendant's motion for mistrial. Accordingly, we affirm Defendant's convictions.

_____